**SECOND DIVISION**
**RICKMAN, C. J.,**
**MILLER, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 26, 2022**

# In the Court of Appeals of Georgia

A22A0773. HACKETT v. STAPLETON et al.

RICKMAN, Chief Judge.

Following the trial court's adjudication of James and Shirley Stapleton as equitable caregivers of a minor child, grant of legal and physical custody of the child to the Stapletons and denial of the father's legitimation petition, the mother appeals. The mother contends that the trial court erred by adjudicating the Stapletons equitable caregivers, awarding custody to the Stapletons, denying the father's legitimation petition, and awarding court registry funds to the Stapletons. For the following reasons, we affirm in part, reverse in part, and remand this case with direction.

We review the evidence in the light most favorable to the trial court's judgment. *Miles v. Skinner*, 361 Ga. App. 764, 764 (863 SE2d 578) (2021). So viewed, the evidence showed that the mother was 20 years old when she gave birth

to the child. At the time of the birth, the mother lived with the child's maternal grandmother. The child's father was deployed in Iraq when he learned the mother was pregnant with the child. At the time the child's father learned of the pregnancy, he testified that the mother expressed that she was not aware of the child's paternity.

After the child was born, the maternal grandmother was given guardianship of the child when he was approximately six months old. The grandmother also obtained a protective order against the mother. The grandmother informed Mrs. Stapleton that the reasons for the protective order were that the mother demanded that the grandmother take care of the child and hit the grandmother at some point. The grandmother knew the Stapletons from work and church and they began to keep the chid occasionally. In the beginning, the child would stay with the Stapletons for just a few hours or overnight. Eventually, however, the child began staying with the Stapletons on a full-time basis. This transition occurred when the child was between six and eleven months of age. When the child was 11 months old, the grandmother obtained a more permanent guardianship order and the Stapletons cared for the child full time.

Despite not having a court order giving them any custody of the child, the Stapletons remained the child's primary caregivers. The mother continued to interact

with the child while he was in the Stapletons' care. The child saw the mother when he visited with his grandmother and she attended birthday parties and cook outs at the Stapleton's home. The mother has always had a room for the child at her home and she testified that it has always been her hope that he would come to live with her. After the child's birth, the mother married and had two other children.

When the child was nine years old, the mother discovered that the grandmother had "dropped" the protective order granting her custody. When the mother arranged for the child to go to the zoo with her other children, a dispute arose between the mother and the Stapletons about the trip. The child ultimately went to the zoo with the mother, who chose to not return him to the Stapletons.

After the zoo trip, the Stapletons filed both a petition for adoption and a motion for expedited hearing and immediate placement of the child. The trial court granted the Stapletons sole and legal custody of the child during the pendency of the action. The trial court also appointed a guardian ad litem ("GAL") and granted visitation to the mother.

Thereafter, the child's father filed a petition for legitimation and child custody. Following the filing of the legitimation petition, the Stapletons stipulated that the trial court could not grant their petition for adoption, but that they had standing to seek

custody of the child pursuant to OCGA § 19-7-3.1, the adjudicated equitable caregiver statute. Additionally, the Stapletons amended their adoption petition seeking to be adjudicated equitable caregivers and to be granted sole and, permanent legal and physical custody of the child.

At the final hearing on all the parties motions, Mrs. Stapleton testified that she had concerns about the child while he was at the mother's house. Mrs. Stapleton explained that in past conversations that she had with the grandmother, she was told that on one occasion the mother and her husband were "arguing and fighting" and that the mother used bad language. Mrs. Stapleton was asked if she thought she was a better parent "simply because [she doesn't] curse" and she responded "I don't cuss in front of him. I think that's better raising, yes, ma'am." When asked if she thought if the child was exposed to these things if he would suffer harm at the mother's home, Mrs. Stapleton replied, "[i]t's possible."

As to the child's father, Mrs. Stapleton testified that at the time the child began living with them, she had no knowledge about the father's identity. At some point, Mrs. Stapleton did learn of the father's name and he came to her residence for a holiday when the child was a toddler. The father did not visit their home again prior to her filing the instant action. The father was awarded visitation during the pendency

4

of this action and Mrs. Stapleton testified that "[h]e would get [the child] on a Friday afternoon, [and] bring him back Friday night. Then he could get him on Saturday morning and get him back Saturday night for so many visits." The father exercised all but one of those visitation opportunities. The father also reached out to the child with text messages and phone calls.

The father testified that he was married and had three other children, one biological and two step children, all of whom live with him and his wife. The father was deployed in Iraq when the child at issue was born and was stationed in Texas when he returned. He explained that when he got back from deployment he immediately took a DNA test and started paying child support to the grandmother.[1] As to developing a relationship with the child, the father testified that he met with the mother and grandmother along with the child when he was an infant. The father subsequently tried to see the child whenever he came home.

When he moved back to Georgia, the father continued to try to get in touch with the mother and the grandmother to see the child. The father was able to arrange to see the child in public places and attended one of his youth sporting eventsn. The

---

[1] The grandmother received all of the child support paid from 2011 to 2019 and she testified that none of that money was ever given to the Stapletons. She testified that she spent most of the money received on items for the child.

father also reached out to the Stapletons on a social media platform explaining that he was paying child support and was having trouble seeing the child. The father did not receive a response. Moving forward, prior to the filing of the adoption petition, the father testified that he was able to talk to the child once or twice a month.

A counselor hired by the Stapletons testified as an expert to explain what he had learned as the child's counselor and to make recommendations based on that relationship. The counselor had met with the child 11 times over a three-month period. He testified that the Stapletons provide for the child's daily needs and that the child and the Stapletons have a healthy interaction with each other. When asked about the potential consequences of removing the child from the Stapletons, the counselor responded,

> Not even specific to this situation, but overall from experience, any removal for a child that's been with a family this long, ever since basically very, very early in his life, I believe from experience would be very detrimental to his mental health and could continue to carry on into physical health and all kinds of other things. Just the unnecessary interruption that that would cause in his life I think could be very detrimental.

The counselor opined that the child should remain with the Stapletons full-time and that the mother and father be given some sort of visitation.

6

Finally, the GAL testified that she had been the child's GAL for approximately 15 months. In that capacity, she had interviewed the Stapletons, the mother and her husband, the father and his wife, school counselors, teachers, employers for the parents, and the grandmother. When she first met the child, he was excited for his father to legitimate him and requested that he be given his father's name. Later, the child indicated that he was "fussed at" by Mr. Stapleton for desiring to have his father's name. When discussing the issues the Stapletons had with the mother and the father, the GAL testified that they did not have concerns about drug usage, job instability or homelessness, "it was just basically, you know, that was a thing for them that they cursed." Both parents and the mother's husband volunteered and passed drug screens.

The GAL testified that she believed the child was conflicted as to what he wanted and he really wanted all parties to get along. The GAL also had concerns because the child did not feel comfortable sharing everything about his life with the Stapletons, including secretly meeting with the mother's other children, his siblings, at school, and that Mrs. Stapleton struggled to share the child with his parents.

In her report, the GAL recommended that the mother have custody of the child explaining:

[A] s this case has moved forward, it has become clear that the only way to facilitate a healthy relationship between this child and all of the parties is for him to be in the custody of one of his parents. . . . The guardian has not been given any evidence of any HARM that would come to this child should he return to his mother's custody. . . . This recommendation for custody will allow more access to the child for all parties and foster the parent-child relationship, which is fiercely guarded under Georgia Law.

The GAL further recommended that the child have regular visitation with the Stapletons and his father. The GAL also recommended that the father's legitimation action be granted because he has attempted to have a meaningful relationship with the child and has paid child support.

Following the hearing, the trial court adjudicated the Stapletons as equitable caregivers and then granted them legal and physical custody of the child with the mother having visitation. The trial court denied the father's legitimation petition, finding that the father abandoned his opportunity interest to develop a relationship with the child.

The mother contends that the trial court erred by adjudicating the Stapletons equitable caregivers, awarding custody to the Stapletons, denying the father's legitimation petition, and awarding funds to the Stapletons.

8

1. The mother contends that the trial court erred by adjudicating the Stapletons equitable caregivers under OCGA § 19-7-3.1.[2]

Pursuant to OCGA § 19-7-3.1 (d), in order for someone to establish standing as an equitable caregiver, the trial court must find by clear and convincing evidence that the person has:

> (1) Fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life; (2) Engaged in consistent caretaking of the child; (3) Established a bonded and dependent relationship with the child, which relationship was fostered or supported by a parent of the child, and such individual and the parent have understood, acknowledged, or accepted that or behaved as though such individual is a parent of the child; (4) Accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and (5) Demonstrated that the child will suffer physical

[2] The mother makes several arguments regarding the form of the Stapletons petition to become equitable caregivers. OCGA § 19-7-3.1 (b) lists what should be included in a pleading when a party is seeking to be adjudicated an equitable caregiver. The statute also includes a sample form and referencing that form, states that "[a] document substantially in the following form may be used to create a pleading." OCGA § 19-7-3.1 (c). "It has long been the rule in Georgia that substance and not mere nomenclature controls in determining the nature of pleadings." (Citation omitted.) *Mickas v. Mickas*, 229 Ga. 10 (2) (189 SE2d 81) (1972). "Courts refrain from attaching too much importance to the merely formal parts of a complaint and construe pleadings so as to do substantial justice." (Footnote omitted.) *Anderson v. Bruce*, 248 Ga. App. 733, 736 (2) (548 SE2d 638) (2001). Accordingly, the trial court properly considered the Stapletons petition to be adjudicated equitable caregivers.

harm or long-term emotional harm and that continuing the relationship between such individual and the child is in the best interest of the child.

When considering whether the child will suffer harm due to the discontinuation of the relationship between the individual and the child the court may consider,

> (1) Who are the past and present caretakers of the child; (2) With whom has the child formed psychological bonds and the strength of those bonds; (3) Whether competing parties evidenced an interest in, and contact with, the child over time; and (4) Whether the child has unique medical or psychological needs that one party is better able to meet.

Here, the record shows the Stapletons fully committed to taking a parental role in the child's life, engaged in the caretaking of the child, and established a bond with the child. The relationship between the Stapletons and the child has been fostered or supported by the mother because she has been aware that the child was in their custody for almost the entirety of his life and she acknowledged through her actions in allowing the child to remain in their custody that she was aware they were taking a parental role in the child's upbringing. It is also undisputed that the Stapletons did not receive any financial support for the child. The child support paid by the father went to the grandmother. Lastly, it is clear from the testimony of the GAL and the

counselor that the child would suffer long term emotional harm if the relationship between the child and the Stapletons' was completely discontinued.

Accordingly, we find that the record supports the trial court's ruling that the Stapletons satisfied, by clear and convincing evidence, all of the required elements of OCGA § 19-7-3.1 such that the trial court did not err when it adjudicated both of them equitable caregivers. See *Skinner v. Miles*, 361 Ga. App. 764, 770 (1) (863 SE2d 578) (2021) (holding that the trial court correctly adjudicated a mother's former life partner as an equitable caregiver).

2. The mother contends that the trial court erred by granting the Stapletons full legal and physical custody of the child.

After a trial court adjudicates a person an equitable caregiver, it "may enter an order as appropriate to establish *parental rights and responsibilities* for such individual, including, but not limited to, custody or visitation." OCGA § 19-7-3.1 (g) (emphasis supplied). Additionally, the equitable caregiver statute clarifies that "[t]he adjudication of a person under this Code section as an equitable caregiver does not disestablish the parentage of any other parent." OCGA § 19-7-3.1 (f).

Unlike OCGA § 19-7-1 (b.1), which addresses custody disputes between a parent and certain third-party relatives, the equitable caregiver statute does not

11

provide guidance on resolving custody disputes between a parent who has not otherwise lost, forfeited or had terminated his or her parental rights and an equitable caregiver. But because the statute states that an equitable caregiver can be given parental rights and responsibilities we look to authority dealing with custody disputes between parents for guidance.

The trial court's duty when determining custody disputes between parents is "to exercise discretion to look to and determine solely what is for the best interest of the child and what will best promote the child's welfare and happiness and to make his or her award accordingly." OCGA § 19-9-3 (a) (2). In determining the best interests of the child, the judge may consider any relevant factor including, but not limited to:

> The love, affection, bonding, and emotional ties existing between each parent and the child; The love, affection, bonding, and emotional ties existing between the child and his or her siblings, half siblings, and stepsiblings and the residence of such other children; The capacity and disposition of each parent to give the child love, affection, and guidance and to continue the education and rearing of the child; Each parent's knowledge and familiarity of the child and the child's needs; The capacity and disposition of each parent to provide the child with food, clothing, medical care, day-to-day needs, and other necessary basic care, with consideration made for the potential payment of child support by

12

the other parent; The home environment of each parent considering the promotion of nurturance and safety of the child rather than superficial or material factors; The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity; The stability of the family unit of each of the parents and the presence or absence of each parent's support systems within the community to benefit the child; The mental and physical health of each parent, except to the extent as provided in Code Section 30-4-5 and this paragraph and such factors as provided in Code Section 15-11-26; Each parent's involvement, or lack thereof, in the child's educational, social, and extracurricular activities; Each parent's employment schedule and the related flexibility or limitations, if any, of a parent to care for the child; The home, school, and community record and history of the child, as well as any health or educational special needs of the child; Each parent's past performance and relative abilities for future performance of parenting responsibilities; The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child; Any recommendation by a court appointed custody evaluator or guardian ad litem; Any evidence of family violence or sexual, mental, or physical child abuse or criminal history of either parent; and Any evidence of substance abuse by either parent.

OCGA § 19-9-3 (a) (3) (A) - (Q).

Here, the trial court found that "[b]ased upon the [Stapletons]' testimony and the testimony of expert witness, [the counselor], and considering all evidence presented by the parties, this [c]ourt specifically finds that [the child] will suffer long-term emotional harm if custody is not granted to [the Stapletons]" The trial court, however, was not authorized to conclude that the Stapletons had demonstrated that the return of the child to his mother would cause long-term emotional harm based upon this record.

Mrs. Stapleton testified that "[i]t's possible" the child would suffer harm if returned to his mother and mainly focused her testimony about the mother around complaints about the mother's language use in the home. The counselor also did not testify the child would suffer long term emotional harm if returned to the mother. The counselor testified generally about the mental health consequences that can result from the removal of a child from a primary caregiver and that the unnecessary interruption in a child's life could be very detrimental. The GAL, of course, testified that it would be in the best interests of the child for custody to be with the mother, and emphasized that the GAL herself "had not been given any evidence of HARM that would come to this child should he return to his mother's custody."

Because the trial court's finding that the child would suffer long-term emotional harm was belied by the record and that finding appears to be the basis for the trial court's custody award, we remand this case for the trial court to again consider the best interest of the child using OCGA § 19-9-3 as guidance. See generally *Ortega v. Temple*, 359 Ga. App. 5, 13 (3) (856 SE2d 471) (2021) (where it was unclear whether trial court used appropriate legal standard, order vacated and case remanded for further proceedings); *Lopez v. Olson*, 314 Ga. App. 533, 542 (3) (724 SE2d 837) (2012) (where trial court failed to apply the correct standard to custody dispute, judgment vacated and case remanded for reconsideration consistent with Court of Appeal's opinion). We note that on remand, "[j]oint custody may be considered as an alternative form of custody by the judge and the judge at any temporary or permanent hearing may grant sole custody, joint custody, joint legal custody, or joint physical custody as appropriate." OCGA § 19-9-3 (a) (1). See *Baldwin v. Baldwin*, 265 Ga. 465, 465 (458 SE2d 126) (1995) (holding that if the trial court finds both parents fit and proper, the trial court may consider a joint custody arrangement).

3. The mother contends that the trial court erred by denying the father's legitimation petition. Under Georgia law,

> [i]n ruling on a legitimation petition presented by a biological father, the juvenile court must initially determine whether the father has abandoned his opportunity interest to develop a relationship with the child. If the juvenile court concludes that the father has abandoned his opportunity interest, that finding is sufficient to end the court's inquiry and justifies the denial of the legitimation petition.

(Citation and punctuation omitted.) *In the Interest of J.M.*, 289 Ga. App. 439, 442 (1) (657 SE2d 337) (2008). "Absent an abuse of discretion, a juvenile court's determination that a biological father has abandoned his opportunity interest must be affirmed." Id.

The trial court found, inter alia, that the father failed to participate in the birth of the child or support the mother during her pregnancy; the father initially denied paternity, but after paternity was confirmed was ordered to pay monthly child support; with the exception of a few gifts, the father has failed to support the child outside of court-ordered child support; the father waited almost ten years to file for legitimation; the father did not make significant efforts to have a meaningful relationship with the child prior to the action filed by the Stapletons; the father only visited the Stapletons house on Christmas Day when the child was a toddler and did not return to their home; and the mother testified that the father made not attempts to

16

contact the child until the child's eleventh birthday; and, as the mother testified, the father made no attempts to contact the child for four years when the child was younger.

First, while it is true that the father testified that he initially was unsure whether the child was his, that does not excuse his inaction during the mother's pregnancy or failure to assume responsibility after his birth. See *In the Interest of J. M.,* 289 Ga. App. at 443 (1) (a). Second, the father waited until the child was almost ten years old to file his legitimation petition, and this long delay supports the trial court's conclusion that he abandoned his opportunity interest. See id. Finally, the record reflects that although the father did make contact with the child over the course of his life, this contact was inconsistent and the father never established frequent visits prior to the pendency of this action. Accordingly, we are constrained to conclude that the trial court did not abuse its discretion in finding that the father abandoned his opportunity interest. See id.; see also *In the Interest of L. S. T.*, 286 Ga. App. 638, 639 (1) (649 SE2d 841) (2007).

4. The mother contends that the trial court erred by awarding the Stapletons the amount of child support that was paid by the father into the court registry during the pendency of this action while the Stapletons were the primary caregivers of the child.

Specifically, the mother argues that OCGA § 19-7-3.1 (d) (4) prohibits the Stapletons from receiving financial compensation as equitable caregivers. That statute, however, only required the Stapletons to show that they "accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation." OCGA § 19-7-3.1 (d) (4). The Stapletons clearly satisfied this condition because, as discussed above, they were the primary caregivers of the child for almost ten years and received no financial compensation. The trial court was not prohibited by this statute from awarding them the child support paid into the registry during the pendency of this action because they were the physical custodians of the child at the time.

*Judgment affirmed in part, reversed in part, and case remanded with direction. Miller, P. J., and Pipkin, J., concur.*